# IN THE COURT OF APPEALS OF IOWA

No. 14-1880
Filed December 9, 2015

IN RE THE MARRIAGE OF DANIEL ALLEN AGUIRRE
AND AMANDA ROSE AGUIRRE

Upon the Petition of
**DANIEL ALLEN AGUIRRE,**
Petitioner-Appellant,

**And Concerning**
**AMANDA ROSE AGUIRRE,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Carla T. Schemmel, Judge.

Daniel Aguirre appeals from the child custody provisions of the decree dissolving his marriage to Amanda Aguirre. **AFFIRMED WITH DIRECTIONS.**

Andrea M. Flanagan of Sporer & Flanagan, P.L.C., Des Moines, for appellant.

Colin McCormack of Van Cleaf & McCormack, L.L.P., Des Moines, for appellee.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Daniel Aguirre appeals from the child custody and parenting schedule provisions of the decree dissolving his marriage to Amanda Aguirre. Having reviewed the record de novo, *see In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013), we affirm.

The following facts are not in dispute. Daniel and Amanda were married in February 2003. Daniel was in military service after graduating from high school and was twice deployed overseas during his marriage to Amanda. Daniel and Amanda have three children. M.A. was born in 2003. B.A. was born in 2005. And though the parties separated in 2010,[1] they attempted a reconciliation, which resulted in the birth of C.A. in March 2012. The attempted reconciliation was not successful.

Daniel began a relationship with Sarah (formerly a friend of Amanda's) in May 2012. Sarah is a licensed practical nurse. Sarah has four children from other relationships. Two children, who were born during her marriage to Lance, are in her sole custody and the children do not see their father. Sarah also has two children by two other fathers who have parenting time with their respective children, though Sarah has physical care. Daniel and Sarah have a child together who was born in 2013.[2]

Daniel filed a dissolution petition in August 2012. Both parties sought physical care of the three children. Daniel quit contributing support to the family

---

[1] Daniel testified they separated in March of 2010. Amanda testified they "started going our separate ways" in September 2010 and she moved in to her mother's residence in April 2011.

[2] Daniel and Sarah's child was four months old at the time of trial in November 2013.

when the parties separated in 2010 until an order on temporary matters was filed on October 23, 2012. Pursuant to the temporary order, Amanda had physical care of the children and the parenting schedule provided the children would be with Daniel every weekend from Friday at 5:30 p.m. to Monday at 8:00 a.m. except for his National Guard weekends, and on Tuesdays after school until Wednesday morning.

Trial was held on November 20 and 21, 2013. At the time of trial, Amanda was unemployed and taking on-line photography courses. She worked several different places during the marriage. Amanda worked at Casey's General Store before M.A. was born. She stayed out of the work force for about a year and then returned to work at Casey's for about six months. Amanda testified she left Casey's when she learned she was pregnant. She returned to work again when B.A. was six months old. Amanda then went to work at Target in Urbandale for six or seven months and quit due to health issues. Amanda has been the children's primary caregiver throughout the marriage.

Daniel was a civilian employee working full time for the Iowa National Guard as a supply sergeant at Camp Dodge, Johnston, Iowa. He testified he had lived with Sarah and her four children "for the past year" and he intended to marry her when the divorce was finalized.

Much of the trial focused on complaints the parents had about the other's home. The court ruled from the bench, stating:

> There are a lot of bad feelings in this case. There have been a lot of improper, distasteful, and conniving activities on both sides. I can see that in the [department of human services] DHS reports. I can also see an inability of the parties to work together. Particularly, when Sarah is involved.

I fully understand the anger you feel towards Sarah. But whether you like it or not, she's going to be your children's stepparent for a long period of time. And I was dismayed by some of your efforts to control what happens at Daniel and Sarah's house.

You thought enough of this man to have children with him. When your children go there so long as they're safe, you don't get to interfere anymore.

I also am very concerned about Sarah's attempts to interfere and criticize what happens at Amanda's house. That also is not right.

And I would ask that you pass that along to Sarah, please.

You two have to parent these children together. And if you can't, it will hurt the children. And you are very different people. That doesn't mean that what you have to offer the children and what you have to offer the children are not needed by the children. They are. And they need both your love and both your support. And they do not need you wasting your time and energy criticizing each other and each other's relationships and each other's families. And the more you do that, the more you hurt your children. And I would hope you keep that in mind.

I am going to tell you, this is a very close call. I'm going to award joint legal custody. And I'm going to award Amanda physical custody.

But I'm going to caution you, Amanda, that interference with your children's relationship with their father can lead to a change in that. The Iowa Code charges both of you to look to the best interests of the child, which means you are required to facilitate the children's relationship with the other parent.

. . . .

As I said, it was a very close call. I think you both love your kids. I think you're both capable of parenting your children, so long as you keep all these outside influences away from the kids. And you all have a lot from a variety of sources, it appears. Family members, extended family members on both sides.

I am going to further order that none of your children be in the presence of anyone who is on the sex [offender] registry list or who has a finding against them by DHS without direct parental supervision.[3]

---

[3] The court's order is somewhat ambiguous to the extent "or who has a finding against them by DHS." This statement could be read to mean any person who has *any* finding of abuse or neglect. However, the remaining statements by the court make clear that the ruling refers to those persons who have had a finding of sex abuse:

> That means if your brother, or assumed brother [Amanda testified her "brother" was a sex offender] or adopted brother, is in your house, you have to be there. You can't leave them with your dad. You can't leave them with your mom. You have to be there.

. . . .

The tipping point as far as picking Amanda as the custodial parent for me was she has been the kids' primary physical caretaker for all of their lives. Fortunately, that doesn't always control, but in this case I think it should.

The court ordered Daniel would have parenting time every other weekend (Friday at 5:00 p.m. to Sunday at 6:00 p.m.); Tuesday after school until Wednesday morning; designated holidays; and two, one-week periods during the summer. A written decree was filed on February 17, 2014. This appeal followed.

Daniel contends the district court erred in not placing the children in his physical care. Daniel "concedes that past caretaking patterns, including primary caregiving, weigh heavily in custody matters." *In re Marriage of Decker*, 666 N.W.2d 175, 178-80 (Iowa Ct. App. 2003); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (in context of considering whether to award joint physical care where there are two suitable parents, "stability and continuity of caregiving have traditionally been primary factors"). However, he alleges Amanda denied him visitation for several months prior to entry of the temporary order. The record is unclear on the length of time Daniel did not have visits with his children—his testimony was that it was for several months; Amanda stated it was in September 2012, and was because Sarah's brother (who had been charged with a serious criminal offense) was living in the house. In any event, there are no complaints that Daniel was denied parenting time after entry of the temporary custody order in October 2012.

---

That also means that you can leave the kids at your house with Connie [Daniel's mother, whose husband had been found to have committed sexual abuse], but if Connie's husband is there, at least the way things stand now, you have to be there.

While the parties focused on each other's negative traits at trial, it is clear both parents love their children and are capable and willing to provide physical care. The district court's findings suggest the court did not find either Amanda or Sarah's testimony about the other's deficiencies particularly credible. While we are not bound by the trial court's findings of fact in our de novo review, we give them weight, particularly in matters of witness credibility. Iowa R. App. P. 6.903(4)(g).

> There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented.

*In re Marriage of Vrban*, 359 N.W2d 420, 423 (Iowa 1984) (internal citation omitted).

The district court considered all the relevant factors concerning child custody and determined the question was a "very close call" and the "tipping point" was that Amanda had always been the children's primary caretaker. We find no reason to disturb that ruling.

Daniel contends the district court "minimized" his visitation. This is a mischaracterization of the court's decree. The decree provides:

> Daniel and Amanda shall establish a parenting schedule which shall be liberal and shall provide the opportunity for the maximum continuous physical and emotional contact possible between both parents and the minor children. In the event that the parties are not able to agree on the actual terms and details of such

a parenting schedule, the following schedule represents the schedule during which the children shall be with [Daniel].[4]

Daniel also argues the court improperly reduced the parenting time he had been awarded in the order setting temporary custody and support. Temporary orders are not binding and create no presumption with respect to the final custody decision. *See In re Marriage of Swenka*, 576 N.W.2d 615, 617 (Iowa 1988); *see also In re Marriage of Denly*, 590 N.W.2d 48, 52 (Iowa 1999) ("[W]hich party is awarded custody of the couple's child or children on a temporary basis is not a factor that the district court is to consider in determining the final custody arrangement."). Upon our de novo review, we affirm the parenting schedule, except we order a correction of the scrivener's error on page five of the decree as noted above.

Amanda seeks an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within our discretion. *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. *Id.* Given the circumstances of the parties in this action, we award Amanda appellate attorney fees in the amount of $2000.

**AFFIRMED WITH DIRECTIONS.**

---

[4] There is an obvious scrivener's error on page five of the decree as the name appearing in the decree prior to the colon is "Amanda." We order a correction of the error.